IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


DAN GLANDON,                    )
                               )      NO. 4:04-cv-10355-RAW
          Plaintiff,           )
                               )      RULING ON
   vs.                         )      DEFENDANT'S MOTION
                               )      FOR SUMMARY JUDGMENT
KEOKUK COUNTY HEALTH CENTER,   )
                               )
          Defendant.           )


          Defendant's resisted Motion for Summary Judgment (#28) is

before the Court following hearing. Plaintiff Dan Glandon was

Director of Ambulance Services for defendant Keokuk County Health

Center (KCHC) until his employment was terminated on July 3, 2003.

On January 13, 2004, Glandon filed a lawsuit in the Iowa District

Court for Keokuk County in which he brought two causes of action:

wrongful termination in violation of Iowa's Veterans Preference

statute, Iowa Code § 35C.6 (Count I) and a common law claim of

retaliatory termination in violation of public policy (Count II).

On June 24, 2004 he was allowed to amend his petition to bring a

causes of action for violation of his Free Speech rights under the

First Amendment to the U. S. Constitution, one under the authority

of 42 U.S.C. § 1983 (Count III), and the other a non-statutory

direct action (Count IV). KCHC then removed this action to federal

court on July 7, 2004.

In connection with these proceedings plaintiff concedes summary judgment is appropriate with respect to the direct constitutional claim in Count IV. See Bishop v. Tice, 622 F.2d 349, 356 n.12 (8th Cir. 1980). That count will be dismissed without further comment.

The Court has federal question jurisdiction of the federal civil rights claim, 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims, 28 U.S.C. § 1367(a). The case is before the undersigned pursuant to 28 U.S.C. § 636(c).

## I.

### SUMMARY JUDGMENT

Defendant is entitled to summary judgment if the affidavits, pleadings, and discovery materials show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Allsup, Inc. v. Advantage 2000 Consultants, Inc., 428 F.3d 1135, 1138 (8th Cir. 2005); Lund v. Hennepin County, 427 F.3d 1123, 1125 (8th Cir. 2005); Grabovac v. Allstate Ins. Co., 426 F.3d 951, 955 (8th Cir. 2005); Erenberg v. Methodist Hospital, 357 F.3d 787, 791 (8th Cir. 2004); Fed. R. Civ. P. 56(c); see Baucom v. Holiday Companies, 428 F.3d 764, 766 (8th Cir. 2005). The Court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to

2

speculation." <u>Mathes v. Furniture Brands Int'l, Inc.</u>, 266 F.3d 884, 885-86 (8th Cir. 2001)(citing <u>Sprenger v. Federal Home Loan Bank of Des Moines</u>, 253 F.3d 1106, 1110 (8th Cir. 2001)); <u>see</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Howard v. Columbia Public Schl. Dist.</u>, 363 F.3d 797, 800 (8th Cir. 2004)("unreasonable inferences or sheer speculation" not accepted as fact); <u>Erenberg</u>, 357 F.3d at 791. An issue of material fact is genuine if it has a real basis in the record. <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395 (8th Cir. 1992) (citing <u>Matsushita</u>, 475 U.S. at 586-87 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." <u>Hartnagel</u>, 953 F. 2d at 395 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)); <u>see</u> <u>Hitt v. Harsco Corp.</u>, 356 F.3d 920, 923 (8th Cir. 2004); <u>Rouse v. Benson</u>, 193 F.3d 936, 939 (8th Cir. 1999); <u>cf.</u> <u>Johnson v. University of Iowa, St. Bd. of Regents</u>, __ F.3d ___, 2005 WL 3436596, *2 (8th Cir. Dec. 15, 2005)("Summary judgment is still appropriate . . . when the disputed facts will not affect the outcome of the suit"); <u>Baucom</u>, 428 F.3d at 766("There is no genuine issue of material fact if the evidence is such that a reasonable jury could not return a verdict for [plaintiff]").

It is the non-moving party's obligation to "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue of material fact." <u>Rouse</u>, 193 F.3d at 939; <u>see</u> <u>Baucom</u>, 428 F.3d at 766 (plaintiff may not rely on "mere allegations"); <u>Hitt</u>, 356 F.3d at 923. "We consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." <u>Howard</u>, 363 F.3d at 801. In assessing a motion for summary judgment a court must determine whether a fair-minded trier of fact could reasonably find for the nonmoving party based on the evidence presented. <u>Anderson</u>, 477 U.S. at 248; <u>Herring v. Canada Life Assurance Co.</u>, 207 F.3d 1026, 1030 (8th Cir. 2000).

## II.

### FACTUAL BACKGROUND

Dan Glandon was a member of the United States Coast Guard from 1979 until he retired in 2001. He worked with machinery and in engineering in the Coast Guard and took miscellaneous classes at College of the Redwoods, anatomy and physiology. (Pl. App. at 3-4). While he was still in the Coast Guard he received EMS training in California in 1999. (<u>Id.</u> at 4). Toward the end of his career in the Coast Guard, Glandon worked as a paramedic in Eureka, California. (<u>Id.</u>) After his honorable discharge in June 2001, he moved to Iowa to be close to his mother. Glandon took employment with KCHC as an EMT-paramedic. (<u>Id.</u> at 5). He was hired by Mike Sellers, who was Director of Ambulance Services. Sellers reported to CEO Mike

Trachta. (_Id._ at 6). Sellers left the position and Trachta offered it to Glandon. (_Id._) Glandon became Director of Ambulance Services in October 2001. Shortly afterward Trachta left KCHC and David Wright, the CFO, took over as interim CEO. (_Id._) In May 2002 Chad Wolbers took over as CEO and Wright stepped back to the CFO position. (_Id._ at 7). Glandon's duties included patient care associated with ambulance services, maintaining equipment, ordering supplies, coordination of the county's EMS teams and volunteer agencies, and training ambulance staff and later hospital staff. (_Id._ at 6).

During the time period in question Jerlyn Bowers was the Director of Nursing. (Pl. App. at 69-70). Bowers was responsible for patient care issues on hospital floors in the patient rooms, for the equipment and training of nurses on the patient floors, and for the ER and ER staff. She also had supervisory authority over ambulance staff when they were asked to come help on the patient floors. (_Id._ at 14).

On many occasions during his employment Glandon voiced concerns or made complaints to Wolbers and Bowers about patient care issues through written "occurrence reports," e-mails, or verbally. The content of these is not set out in the record with specificity, however, Glandon gave some examples in his deposition testimony. He complained about nurses in the ER failing to follow protocols and common medical practices (Pl. App. at 14); about

nursing staff letting their advanced Cardiac Life Support CPR certifications lapse (id. at 16); and about whether the nursing staff adequately maintained "spinal immobilization" on trauma patients in the emergency room or were familiar with the use of MRL's, C-spine, C-collar and the "long back board" on such patients. (Id. at 12, 76).

Bowers had numerous discussions with Glandon about the issues he raised and complained to Wolbers many times about Glandon. (Pl. App. at 73, 87). Bowers came to dislike Glandon and took his criticisms of the nursing department personally. (Id. at 73, 81). Both met with Wolbers on several occasions to try to work out problems. (Id. at 15). One of the problems they discussed was disagreement concerning air transport of patients. Glandon had arranged that patients being transported with severe trauma would be taken directly to the helicopter landing pad for transport to the nearest appropriate facility instead of going through the KCHC ER first. (Id. at 16). This sometimes involved patients waiting in an ambulance at the hospital until the helicopter arrived. Bowers believed patients should be brought into the ER where a physician could stabilize them while waiting for the helicopter and felt Glandon was making medical judgments which should be made by physicians. (Id. at 77). The nursing staff saw Glandon's reluctance to bring the patients into the ER as an indication he distrusted the care they would receive in the ER from the nurses. (Id. at 16).

Glandon tried on many occasions to arrange to address KCHC's Board of Trustees about the patient care concerns he had been raising. He claims Wolbers kept telling him he would do something about the patient care issues and that Glandon would get to speak to the board, but Wolbers did not keep those promises. (Pl. App. at 19). Glandon viewed Wolbers as having gone back on his word and told him he was "a man without integrity." (Id.) In February 2003 Glandon was able to address the executive committee of the board about his patient care concerns. He did not feel the meeting had a "positive result." (Id. at 19-20). The committee made it clear to Glandon that he should "get over it and move on." (Id. at 20).

On two occasions Glandon made comments to Wolbers to the effect that he was thinking of resigning because he had not been supported. (Pl. App. at 13). Glandon admits Wolbers talked to him about the tone of voice he use in dealing with co-workers, telling him his tone was taken as unfriendly. (Id. at 18). Glandon testified he normally used "a tone of voice that I'm not misunderstood." (Id.)

In March 2003 the nurses met with Wolbers as a group to discuss their complaints about Glandon. (Pl. App. at 62). As the Court understands the summary judgment record, prior to the meeting the nurses prepared a memorandum of their concerns, which they shared with Bowers. (Id. at 82). In it they wrote:

> We are tired of Dan Glandon looking over our
> shoulders. Dan is not our Director and we do
> not want to have to answer to him. We can not
> [sic] give our patients the quality of care
> they deserve if we are constantly worried
> whether or not we will be written up during
> the course of treatment.
>
> We will not address one more incident report
> from the ambulance department unless it has
> been made from our Director [of Nursing].

(Id. at 94). The nurses said they were "sticking together" and that "it has gotten to the point where if Dan Glandon is not stopped we (as a group) are ready to walk." (Id.) Presumably the nurses discussed the concerns outlined in their memorandum with Wolbers during their meeting with him, though precisely what was said at the meeting is not clear from the summary judgment record. Whatever they discussed, Wolbers did not discuss the meeting with Glandon. (Pl. Stmt. of Add'l Facts ¶ 28).

On May 13, 2003, Wolbers met with Glandon and Bowers together and provided them each with written expectations for improvements in their professional relationship. (Def. App. at 36-37).

> In the past I've expressed to the both of you
> that I have concerns about your professional
> working relationship with one another. I feel,
> as I'm certain do numerous others, (including
> trustees and staff) that your strained
> relationship is beginning to weigh on the
> organization. As such I feel it is imperative
> that I take action to attempt to mend the rift
> between the two of you as the tone we set as a
> leadership team is the tone that is reflected
> throughout the rest of the organization.
> Attempts I have made in the past to resolve

issues between the two of you have been met with limited success. This is why I feel it is important for me to clearly spell out, in writing my expectations of the two of you in repairing your relationship and thus improving the culture of our organization.

Here is what I'm asking to happen, at a minimum, in your efforts to improve you [sic] working relationship:

1.   Between now and July 1st, I am asking that the two of you facilitate at least two nurse-paramedic meetings. I ask that you make the attendance mandatory and that you both are in attendance. Please adjust your schedules so that you can both attend and that there are no scheduled transfers, meetings etc. I ask that each one of your facilitate one meeting. The agenda will be yours to create. I know past meetings have included chart review, skills training, and education.

2.   From this point forward, I am asking that you treat each other and one another's staff with courtesy. At a minimum, you are to acknowledge all staff with a "hello." Staff have shared that they are being ignored.

3.   In the near future, I intend to ask a professional in the field of conflict resolution to facilitate a discussion between the two of you, and perhaps the three of us, to see if we can't somehow improve the leadership team environment. Your participation in this process will be mandatory. I will be in contact with you about when we can arrange this discussion.

At the end of June, we will assess whether or not any progress has been made in repairing your working relationship. If your professional relationship does not improve or is not improving, than [sic] I will need to make a decision regarding the future structure of the leadership team.

(Id. at 36).

9

In early June 2003 Wolbers called a meeting between the nursing staff and the paramedic staff. (Def. App. at 19). In his deposition testimony Glandon summarized the meeting and its upshot as follows:

> . . . [T]he nurses that were present made it very clear that I was neither their supervisor and they didn't want me as their supervisor and had no intentions of listening to anything I had to say regarding patient care.
> It was after that meeting that I told Mr. Wolbers and Jeryln Bowers that I would have nothing at all to do with the care on the patient floor unless it directly related to patient care, a patient going to be hurt; that I was basically staying out of that department completely until related to patient care concerns.

(Id.)

In a subsequent June 12, 2003 e-mail to Bowers, which Bowers sent on to Wolbers, Glandon announced he was washing his hands of involvement with the nurses except in limited circumstances. He followed up with an e-mail to Bowers in which he stated in:

> In Closing as I said yesterday I have absolutely no desire to be involved with the nursing floor whatsoever. Whatever happens up there, good or bad, will NOT be addressed by me. The only time I will say anything is when my professional career is at stake for not saying something. When it comes to the ER I will be an advocate for my patients. You may put your staff at rest regarding being "written up" since evidently they still don't understand. "I will close my eyes to all events unless they affect me or my patients." This is the reason I avoid the floor at all

costs so I don't see or hear anything that I
will feel obligated to mention.

(Def. App. at 38-39). As Glandon admits, by this time his working
relationship with Bowers and the nurses had deteriorated to the
point that "communication was pretty well shutting down." (Pl.
Resp. to Def. Stmt. of Facts ¶ 10). Tension was rife between the
paramedics and the nurses. (Id. ¶ 11). It is apparent the cause was
Glandon's repeated complaints about what he describes as patient
care issues and the nursing staff's reaction to being "written up"
by him. (Id. ¶¶ 11, 12).

Into this brittle working environment the alleged HIPAA[1]
complaint issue arrived later in June, the event which precipitated
Glandon's discharge. As Glandon tells it, while driving to Ottumwa
he received a call from one of his employees who asked if there was
any reason an ambulance patient care report was lying face up on a
nurse's desk with a sticky note on it saying "could have been
treated here." (Pl. App. at 24). Glandon immediately called the
hospital privacy officer "on the confidential and anonymous
hotline" and asked the same question.[2] The privacy officer said she

_____

[1] The Health Insurance Portability and Accountability Act of
1996 (HIPAA), Pub. L. 104-191, 110 Stat. 1936.

[2] There is a dispute about whether Glandon called the privacy
officer or a member of the medical records department. Wolbers
contends it was the latter, and that the records employee told him
Glandon had been angry and used an inappropriate tone of voice.
(Def. App. at 2). Glandon denies he contacted the medical records
department (see Pl. Resp. to Def. Stmt. of Facts ¶ 19). At the
(continued...)

11

would check on it. A patient care report contains personal information such as the patient's name, address, social security number and chief medical complaint. Glandon understood from his conversation with his employee that the report was on a desk, which while not in a public area, was near a lot of foot traffic including the families of patients. (<u>Id.</u> at 24-25).

The next contact Glandon had concerning the incident was from Wolbers. (Pl. App. at 25). Another employee had raised the same concern about the same record with the privacy officer. Wolbers undertook an investigation. (Def. App. at 5). He contacted Glandon to request written documentation of his knowledge of the incident. (<u>Id.</u>) According to Glandon, Wolbers told him that the nursing staff was upset, to which Glandon responded he was surprised to hear that because he had called on a confidential, anonymous number to report the incident. (Pl. App. at 25). Because of his concern about confidentiality, Glandon told Wolbers he was not willing to make a written report, but that he would speak with the HIPAA officer and tell what he knew. (<u>Id.</u>) Wolbers made several requests for a written report which Glandon continued to refuse to provide. (Def. App. at 6). Wolbers considered the refusal to be insubordination. (<u>Id.</u>)

---

[2](...continued)
summary judgment stage the Court accepts Glandon's version of events.

On July 3, 2003 Wolbers made the decision to terminate Glandon's employment. He and the Chair of the KCHC Board of Trustees called Glandon into Wolbers' office and presented a detailed written letter setting out the hospital's view of Glandon's conduct and why it necessitated the termination of his employment. The reasons given were (1) the poor working relationship between Glandon and Bowers, and Glandon's failure despite Wolbers' instructions and suggested "strategies" to do anything about it; (2) Glandon's recent distancing of himself from the nurses and health center; (3) Glandon's harsh tone, cynicism and unprofessional manner, of which the recent HIPAA incident was cited as an example; (4) insubordination in failing to provide a written account of what occurred from his perspective with respect to the investigation of a potential HIPAA violation; and (5) Glandon's poor attitude toward Wolbers, Bowers, clinical and non-clinical staff, and the health center as a whole. The letter concluded with a request that Glandon resign by July 7. Later that day Glandon told Wolbers he declined to do so. KCHC then terminated Glandon's employment effective July 3, 2003. (Def. App. at 43).

On July 23, 2003 Glandon wrote a six-page rebuttal letter to the members of the KCHC board of trustees in which he took issue with the reasons given in the July 3 letter for the termination of his employment, and requested reinstatement subject to certain conditions. (Def. App. at 44-49). Apparently Glandon requested a

hearing and was allowed to meet with the board's Executive Committee. (<u>Id.</u> at 6). The nature of these proceedings is not shown in the summary judgment record. Glandon was also given an opportunity to speak for five minutes to the entire board of trustees at its regularly scheduled July 29, 2003 meeting. (<u>Id.</u> at 6, 28; Pl. App. at 31). The board also heard from other persons concerning Glandon's "concerns and complaints," presumably in support of Glandon. (Pl. App. at 98). As the first item of business that evening the board passed a resolution allowing members of the public to address the board for no longer than five minutes, hence the time limitation on Glandon's remarks and those of the others who asked to be heard. (<u>Id.</u> at 31, 98). Glandon was not reinstated.

Prior to Glandon's termination Wolbers knew that he was a veteran. (Pl. App. at 46). Wolbers did not know Iowa law afforded veterans a preference in certain employment situations. (<u>Id.</u>) This lawsuit was filed January 13, 2004.

### III.

### DISCUSSION

**A.    Section 1983 First Amendment Retaliatory Discharge Claim[3]**

1.    <u>Law</u>

Glandon alleges his discharge was in retaliation for exercising his First Amendment right to speak on a matter of public concern, namely the quality of patient care being provided by the nursing staff at KCHC, and concerning a potential HIPAA violation. "A public employee's speech enjoys limited protection under the First Amendment." <u>Day v. Johnson</u>, 119 F.3d 650, 657 (8th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1055 (1998)(citing <u>Connick v. Myers</u>, 461 U.S. 138, 154 (1983)). The principal protection afforded by the First Amendment to public employee speech is the "right, as a

---

[3] Section 1983 of Title 42 of the U.S. Code provides a cause of action against persons who, under color of state law, deprive another of his or her federal constitutional or statutory rights. KCHC is a county hospital organized under Iowa Code Ch. 347 with a popularly-elected board of trustees who have statutorily-prescribed powers and duties, <u>see</u> <u>id.</u> §§ 347.9, .13, .14, .25, including the power to hire employees and the general management, control and government of the hospital. <u>Id.</u> §§ 347.13(5), .14(11). The maintenance and operation of county hospitals in Iowa is supported by property tax levies. <u>Id.</u> § 347.7. KCHC does not deny its discharge of Glandon was under color of state law.
To establish a claim against a governmental entity, as opposed to an individual state actor, it must be shown that "the decisionmaker possess[ed] final authority to establish municipal policy to the action ordered." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986). KCHC has also not disputed that Wolbers' action in terminating Glandon, ratified by the board of trustees, meets this standard.

citizen, to participate in discussions concerning public affairs . . . ." Connick, 461 U.S. at 154.

Whether the First Amendment protects a public employee from discharge because of his or her speech involves a two-step legal analysis. See Shands v. City of Kennett, 993 F.2d 1337, 1341 (8th Cir. 1993), cert. denied, 510 U.S. 1072 (1994). The two steps are derived from two Supreme Court cases, Connick and Pickering v. Board of Education, 391 U.S. 563 (1968). Connick mandates that the court first determine if the public employee speech can "be fairly characterized as constituting speech on a matter of public concern." 461 U.S. at 146. Speech involves a matter of public concern when it addresses a "matter of political, social, or other concern to the community" at large. Id. at 146. In deciding the issue, a court "must analyze the content, form, and context of the speech to determine whether the speaker was acting primarily as a concerned citizen or as an employee" to further the employee's private interests. Schilcher v. Univ. of Arkansas, 387 F.3d 959, 963 (8th Cir. 2004).

That a public employee speaks privately to the employer rather than publicly is not determinative. The First Amendment protects public and private speech. Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 397 (8th Cir. 1995), cert. denied, 517 U.S. 1166 (1996)(citing Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 414-16 (1979)).

16

If the speech addresses a matter of public concern, the court then must balance the "interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the [public agency], as an employer in promoting the efficiency of the public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568; <u>see</u> <u>Belk v. City of Eldon</u>, 228 F.3d 872, 878 (8th Cir. 2000), <u>cert. denied</u>, 532 U.S. 1008 (2001). The <u>Pickering</u> balancing of these competing interests is "highly fact-specific" and involves consideration of a number of interrelated factors. <u>Belk</u>, 228 F.3d at 880. These include:

> (1) the need for harmony in the office or workplace; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or would cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the speech arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

<u>Id.</u> at 880-81. "The <u>Pickering</u> balance is flexible, and the weight to be given any one factor depends upon the specific circumstances of each case." <u>Shands</u>, 993 F.2d at 1344.

The defendant has the burden of producing sufficient evidence of a disruptive effect of the speech on its operations to trigger the <u>Pickering</u> balancing test. <u>Belk</u>, 228 F.3d at 881; <u>Kincade</u>, 64 F.3d at 397. Mere assertions are not enough. <u>Kincade</u>, 64 F.3d at 398 (quoting <u>Grantham v. Trickey</u>, 21 F.3d 289, 294 (8th

Cir. 1994)). When an employee criticizes other employees relating to a matter of public concern, some hard feelings and a measure of disruption is to be expected. That is not what Pickering is about. Before Pickering is implicated the employer must proffer sufficient evidence of an actual adverse effect on the efficiency of the government employer's operations. Belk, 228 F.3d at 881 (quoting Sexton v. Martin, 210 F.3d 905, 911-12 (8th Cir. 2005)(citing in turn Burnham v. Ianni, 119 F.3d 668, 678-79 (8th Cir. 1997)). The more substantial the matter of public concern in question, the greater the employer's showing of disruption must be before the speech may be punished. Id.; see Roth v. Veterans Admin., 856 F.2d 1401, 1407 (9th Cir. 1988).

Both steps in the Pickering/Connick analysis are questions of law for the Court to decide. Connick, 461 U.S. at 148 n.7; Belk, 228 F.3d at 878; Shands, 993 F.2d at 1342. If the outcome depends on the resolution of underlying disputed issues of fact, those issues should be submitted to the jury on special interrogatories or special verdict forms. Belk, 228 F.3d at 878 (citing Shands, 993 F.2d at 1342).

If the two-step analysis works out in favor of a finding that the public employee's speech was protected, the employee must establish a causal connection to the adverse employment action. See Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 801 (8th Cir), cert. denied, 125 S. Ct. 436 (2004); Duffy v. McPhillips, 276 F.3d

988, 991 (8th Cir. 2002). From there the analysis can go in one of two directions, see Graning v. Sherburne County, 172 F.3d 611, 615 n.3 (8th Cir. 1999), but the parties seem to agree the McDonnell Douglas[4] burden-shifting analysis applies in this case, the employer must articulate a legitimate, nondiscriminatory reason for its actions, whereupon the burden shifts back to the employee to show the action was a pretext for illegal retaliation. See Duffy, 276 F.3d at 991 (citing Graning, 172 F.3d at 615).

2.   Analysis

KCHC does not appear to quarrel with the proposition that speech concerning the quality of patient health care in a local hospital addresses a matter of public concern. Generally, "[t]he quality of patient care in state hospitals presents an issue of public concern." Rodgers v. Banks, 344 F.3d 587, 600-01 (6th Cir. 2003); see Ulrich v. City and County of San Francisco, 308 F.3d 968, 978-79 (9th Cir. 2002)(physician's protests concerning layoff of physicians "touched on the ability of the hospital to care adequately for patients"); Craven v. University of Colorado Hosp. Authority, 260 F.3d 1218, 1226-27 (10th Cir. 2001)(assuming for the sake of analysis that speech regarding internal air quality and radiation safety involved matters of public concern); Paradis v. Montrose Memorial Hosp., 157 F.3d 815, 818 (10th Cir. 1998)(speech that hospital administrators "based patients' treatment on their

_____

[4] 411 U.S. 792 (1973).

ability to pay, practiced medicine without a license, engaged in insurance fraud," are "self-evidently matters of 'political, social, or other concern to the community'"); <u>Frazier v. King</u>, 873 F.2d 820, 825-26 (5th Cir. 1989)("'quality of nursing care given to . . . inmates, is a matter of public concern,'" citing <u>Brawner v. City of Richardson, Texas</u>, 855 F.2d 187, 192 (5th Cir. 1988)); <u>Smith v. Cleburne Co. Hosp.</u>, 870 F.2d 1375, 1377, 1382 (8th Cir. 1989)(speech about quality of patient care, including problems in nursing, a matter of public concern). Likewise, speech revealing a potential violation of HIPAA's patient information confidentiality requirements is undoubtedly a matter of public concern. Instead, KCHC questions whether Glandon spoke primarily as a concerned citizen, arguing his real aim in attacking the nurses was "to advance his career as Director of the hospital ambulance service." (Def. Brief at 9).

In the Court's judgment the summary judgment record is not sufficient to permit a determination of Glandon's role in speaking as he did as a matter of law. Indeed, apart from Glandon's testimony concerning his HIPAA-related comments, the content and background circumstances concerning the claimed protected speech is not very clear.

On the other hand, there are no underlying disputed issues of material fact which affect the outcome of the <u>Pickering</u> analysis. The ultimate question is whether Glandon's interest in

speaking as he did about the claimed patient care issues outweighs the interests of KCHC in promoting the efficiency of the services it performed for the public through its employees. As a predicate matter, there is no question that Glandon's speech had a substantial adverse impact on the operations of the hospital. Glandon was not a rank-and-file employee; he was the Director of Ambulance Services responsible to the hospital's CEO, Wolbers. His repeated criticisms were seen by the nursing staff as interference with the performance of their jobs by someone without their training and who had no supervisory authority over them. Ultimately Glandon's working relationship with the Director of Nursing was ruined. The "fault" for the breakdown in the relationship between Bowers and the nurses on one hand, and Glandon and the paramedics on the other and the ensuing disruption is not the issue, the fact is it was real and resulted from the alleged protected speech. The relationship had, as Glandon testified, "pretty well shut down." No one questions that cooperation and effective communication between nurses who care for patients on their arrival at the hospital and the paramedics who provide the initial emergency care and bring the patients to the hospital is important to the overall quality of care provided by KCHC to its patients. The disruption in the relationship between the nurses and paramedics thus had an adverse effect on hospital operations of critical importance to the

community. It was, in the Court's judgment, significant enough to require the balancing of the _Pickering_ factors.

There was a need for harmony between the nurses and paramedics in the discharge of their patient care responsibilities. Where lives are at stake those providing medical care, particularly emergency care, have to be able to work together harmoniously for the sake of the patient. Glandon's repeated criticisms of the nurses caused disharmony between the two groups. Similarly, the nurses and paramedics, like their leaders Bowers and Glandon, should have had a close working relationship. That relationship deteriorated as a result of the speech in question.

The time, manner, and place of the speech, as well as its context cuts both ways. Glandon's criticisms were made internally and he says he followed hospital protocol in formally reporting his concerns, both of which weigh in his favor. (_See_ Pl. Stmt. of Add'l Facts ¶ 31). On the other hand, there were complaints about Glandon's tone of voice and it is fair to infer from his own description of it that it was somewhat loud. Glandon's post-termination letter to the hospital trustees is revealing about how he conducted himself. He referred to himself as a "strong leader" and appeared to recognize others might perceive him as making personal attacks or posing a threat. (Def. App. at 48). He wrote: "I don't blindly follow, I ask questions, I offer solutions, and I stand my ground for moral and truthful issues. I will always

protect patients and demand nothing but the best in regards to patient care. I am a strong leader that will protect the professional credibility of paramedics." (_Id._) All of these traits, of course, can be desirable qualities, but in the context of the dispute here reinforce the impression that Glandon tended to be blunt and unyielding in his opinions.

On May 13, 2003 Wolbers wrote to Bowers and Glandon noting his concerns about their worsening working relationship and its effect on the hospital. He laid out specific steps to be taken to improve the relationship and put them on notice that if improvement did not occur he would be compelled to make decisions about the "future structure of the leadership." Not much progress was made, in fact the situation deteriorated. When at the June 2003 joint nurse and paramedic staff meeting the nurses voiced their disapproval of Glandon's involvement in their work, he announced he would have nothing further to do with the nursing floor in an e-mail to Bowers, the tone and tenor of which was counterproductive to the rehabilitation of their relationship. Along the way Glandon, dissatisfied with Wolbers' response to his complaints and requests, told Wolbers he lacked integrity, thus injuring his relationship with his superior. On notice Wolbers expected a change, Glandon did little to improve the situation. When at the end Glandon refused to comply with Wolbers' request that he provide a written description of his knowledge of the potential HIPAA violation, he brought

himself in direct conflict with Wolbers. When speech leads to a challenge to a supervisor's authority, the supervisor's discharge decision is entitled to a measure of deference. <u>Shands</u>, 983 F.2d at 1346.

The speech critical of the nurses was internal to the hospital and, as noted, its content has not been described with much specificity. Consequently, the degree of public interest in the speech is not a significant factor.

Finally, the tension and disruption in the relationship between the nurses and paramedics engendered by Glandon's speech impeded his ability to fully perform his duties and also affected Bowers' ability to perform hers in that it impaired their ability to communicate with each other effectively on patient care issues.

Application of the <u>Pickering</u> factors leads the Court to conclude that KCHC has shown that the balance of interests supports deference to its action in discharging Glandon. The alleged protected speech adversely affected the "effective and efficient fulfillment of [KCHC's] responsibilities to the public" to provide hospital services, and was significantly disruptive in kind and degree so as to place it beyond the protection of the First Amendment as a matter of law. KCHC is entitled to summary judgment on Glandon's § 1983 retaliatory discharge claim.

24

**B.    State Law Claims**

1.    <u>Wrongful Termination in Violation of Public Policy</u>

For this claim Glandon contends he was discharged as a result of reporting a potential HIPAA violation to KCHC's privacy officer and that this amounted to actionable wrongful termination under the public policy exception to the at-will employment rule in Iowa. To establish a claim of wrongful discharge in violation of public policy, a plaintiff must prove:

> (1) The existence of a clearly defined public policy that protects an activity.
> (2) This policy would be undermined by a discharge from employment.
> (3) The challenged discharge was the result of participating in the protected activity.
> (4) There was lack of other justification for the termination.

<u>Davis v. Horton</u>, 661 N.W.2d 533, 535 (Iowa 2003)(quoting <u>Fitzgerald v. Salsbury Chem., Inc.</u>, 613 N.W.2d 275, 281 (Iowa 2000)). "These requirements have been identified as the clarity element, jeopardy element, causation element, and absence-of-justification element." <u>Davis</u>, 661 N.W.2d at 535-36 (citing <u>Fitzgerald</u>, 613 N.W.2d at 281). The causation element is established by proof that the protected conduct was a "determining factor" in the discharge decision; that is, a factor "that tips the scales decisively in either direction." <u>Graves v. O'Hara</u>, 576 N.W.2d 625, 628 (Iowa App. 1998)(citing <u>Smith v. Smithway Motor Xpress, Inc.</u>, 464 N.W.2d 682, 686 (Iowa 1990)). Stated otherwise, a determining factor is the "final straw." <u>Davis</u>, 661 N.W.2d at 536.

KCHC moves for summary judgment solely on the basis that the evidence on the causation element is insufficient. It is evident that the "final straw" in the sequence of events which led up to Glandon's discharge was the HIPAA episode -- Glandon's call to the privacy officer about the ambulance patient care report left out on the nurse's desk. As KCHC succinctly summarizes its argument: "It was Plaintiff's inappropriate tone and demeanor, not the inquiry itself, in addition to Plaintiff's subsequent refusal to cooperate in the hospital's investigation, which contributed to the decision to terminate Plaintiff's employment." (Def. Reply at 11).

Causation usually presents a question of fact, and certainly so if differing inferences can reasonably be drawn from the undisputed facts. See Fitzgerald, 613 N.W.2d at 289. Whether the determining factor was the question raised by Glandon, or the manner in which he raised it and subsequent refusal to write down what he knew, is a hair too fine to split on summary judgment. Glandon's call was in a similar vein to the many complaints he had made about the nursing staff. As noted previously, these had disrupted the work of the hospital and were a concern to Wolbers. If Glandon is believed, Wolbers made comments to him which indicated Glandon's call to the privacy officer had stirred up the nurses again. Viewing the record favorably to Glandon, as the Court must, it would not be beyond reason for the jury to conclude that

by the time Glandon made his call to the privacy officer to complain about one of his department's medical records being open on a nurse's desk, Wolbers had had a bellyful of his complaints and this one was the last straw. The record evinces many reasons for Glandon's discharge, but the determining factor need not be the sole reason or even the main reason for the discharge decision, it need only be the reason which decisively tips the scales. <u>Smith</u>, 464 N.W.2d at 686.

The motion for summary judgment will be denied on the wrongful termination claim.

2.   <u>Violation of Iowa Veterans Preference Act</u>

The Iowa Veterans Preference Act provides

> No person holding a public position by appointment or employment, and belonging to any of the classes of persons to whom a preference is herein granted, shall be removed from such position or employment except for incompetency or misconduct shown after a hearing, upon due notice, upon stated charges, and with the right of such employee or appointee to a review by a writ of certiorari or at such person's election, to judicial review in accordance with the terms of the Iowa administrative procedure Act, chapter 17A, if that is otherwise applicable to their case.

Iowa Code § 35C.6 (2005). The Eighth Circuit has construed this statute to create a property interest in employment if the employee falls within purview of the law, which finding in turn mandates due process procedures. <u>Winter v. Cerro Gordo County Conservation Bd.</u>, 925 F.2d 1069, 1071-72 (8th Cir. 1991). The statute provides for

27

notice and a pre-termination hearing before a covered employee can be discharged. <u>Id.</u> at 1072. The Iowa Supreme Court has noted that "the type of hearing called for by [the statute] is not described in the statute . . . . [S]ome flexibility is called for in determining the type of predischarge hearing that must be afforded. . . ." <u>Kern v. Saydel Comm. Schl. Dist.</u>, 637 N.W.2d 157, 161 (Iowa 2001). The <u>Kern</u> court also observed that "a full and complete [postdischarge] evidentiary hearing pursuant to a formal postdischarge procedure would, in conjunction with pre-discharge notice and an opportunity to respond, satisfy the requirements of due process." <u>Id.</u>

As a consequence of the veterans preference law a public employee who is a covered veteran is not an employee at will, but rather, he or she may only be discharged for incompetency or misconduct following notice of the reasons claimed to support these grounds and the opportunity for an evidentiary hearing. In <u>Kern</u> the Iowa Supreme Court quoted with apparent approval a state Attorney General Opinion to the effect that the charges of incompetence or misconduct must be sustained by a preponderance of the evidence. 637 N.W.2d at 160 (quoting 1909 Op. Iowa Atty. Gen. 146).

For purposes of its motion KCHC concedes it is a public employer subject to § 35C.6 and Glandon was a veteran entitled to the benefit of the statute. <u>See</u> Iowa Code §§ 35.1(2)(a), 35 C.1(1). Pointing to the <u>Kern</u> court's observation that "some flexibility is

28

called for in determining the type of predischarge hearing that must be afforded," 637 N.W.2d at 161, KCHC argues Glandon's opportunity to address the Executive Committee of the board of trustees in February 2003; Wolbers' May 13, 2003 letter setting out his expectations for improved working relationships and hinting at some kind of employment decision in June if that did not occur; the meeting between Wolbers, the trustees' chair and Glandon on July 3, 2003 at which Glandon was handed the letter detailing the reasons for his termination; and Glandon's postdischarge appearance before the trustees in which he sought reinstatement, combined to satisfy the purposes of the statute. See Kern, 637 N.W.2d at 161 ("the purpose of section 35C.6 is to ensure veterans permanency of employment and protect them from removal except for their own incompetency or misconduct," citing Edwards v. Civil Serv. Comm'n, 227 Iowa 74, 79, 287 N.W. 285, 287 (1939)). The Court disagrees. Glandon was not afforded the process contemplated by the statute or as discussed in Kern. The February 2003 meeting with the Executive Committee of the board of trustees had nothing to do with Glandon's prospective termination. He had been given no notice or description of any charges at that time. Wolbers' May 13, 2003 letter was directed jointly to Glandon and Bowers in an effort to improve their working relationship. It did not level charges of incompetency or misconduct against Glandon and did not give him notice that termination of his employment was being considered. The

discharge decision had already been made at the time Glandon met with Wolbers and the chair of the board of trustees on July 3, 2003. All that remained was for him to decide if he would be terminated by resignation or discharge. The five minutes Glandon was allotted after his discharge to argue his case for reinstatement before the board of trustees was clearly insufficient as a "full and complete" postdischarge evidentiary hearing. In fact, Wolbers was unaware Glandon might have rights under the statute, as were, in all probability, the trustees, and as a result no effort was made to comply with the statute.

The motion for summary judgment will be denied on the veterans preference claim.

**C.   Supplemental Jurisdiction**

All federal claims have been dismissed, and there is no other basis for original jurisdiction in this Court. The question arises whether the Court should retain supplemental jurisdiction under the authority of 28 U.S.C. § 1367(a), (c). A federal district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction." Id. § 1367(c)(3). In deciding to continue to exercise supplemental jurisdiction the Court must consider and weigh "the values of judicial economy, convenience, fairness and comity" articulated by the Supreme Court in United Mine Workers of America v. Gibbs, 383 U.S. 715, 726-27 (1966). Judicial economy,

convenience and fairness argue in favor of the retention of supplemental jurisdiction. Trial is close at hand, scheduled for January 23, 2006. Remand of the state law claims to the state court would involve delay and further expense in bringing the case to issue. Considerations of comity are not significantly involved. The state law claims are factually straightforward and the underlying state law is relatively well-established. There being no sound reason to decline supplemental jurisdiction, and good reason to continue to exercise such jurisdiction, this Court will retain the case.

## IV.

### RULING AND ORDER

Defendants' motion for summary judgment is **granted in part and denied in part**. It is **granted** with respect to Counts III (§ 1983 First Amendment claim) and IV (the First Amendment non-statutory claim) of the removed Second Amended Petition and **denied** with respect to Counts I (termination in violation of the Veterans Preference law) and II (termination in violation of public policy) of said Petition.

IT IS SO ORDERED.

Dated this 23d day of December, 2005.


 

 

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE